UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-12103-GAO

ANN COX,
Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration,
Defendant.

OPINION AND ORDER
December 9, 2010

O'TOOLE, D.J.

## I.     Introduction

The plaintiff, Ann Cox, appeals the denial of her application for Social Security

Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits by the

Commissioner of the Social Security Administration ("Commissioner"). Cox applied for SSDI

and SSI benefits on November 30, 2006, claiming she became disabled on October 24, 2006.

(Administrative Tr. at 103-109, 110 [hereinafter R.].)[1] Her claim was denied at the initial level of

review on July 25, 2007. (Id. at 69-72.) A Federal Reviewing Official confirmed the denial in a

decision dated April 4, 2008. (Id. at 61-65.) Cox timely filed a written request for a hearing

before an Administrative Law Judge ("ALJ") on April 22, 2008, (id. at 80), and a hearing was

held on December 17, 2008, at which Cox and a vocational expert testified. (Id. at 19). After the

hearing, the ALJ issued a written decision finding that Cox was not disabled. (Id. at 4-18.) The

Decision Review Board declined to overturn the ALJ's decision, and it became the final decision

---

[1] Cox was insured through December 31, 2007. In order to be eligible for benefits, she would
have to establish a disability occurring on or before that date. (R. 8.)

of the Commissioner. (<u>Id.</u> at 1-3.) Cox then filed a timely appeal on December 29, 2009, pursuant to 42 U.S.C. § 405(g).

Before the Court are cross-motions to reverse, and alternatively to affirm, the decision of the Commissioner. Concluding that the administrative record substantially supports the ALJ's decision and that no error of law was made, this Court now affirms.

## II.    Factual Background

At the time she applied for SSDI and SSI benefits, Cox was thirty-four years old. (R. at 103.) She is a high school graduate who completed six months of college. (<u>Id.</u> at 25.) Her past work experience consisted mainly of bartending and waitressing positions. (<u>Id.</u> at 26.) She is five feet, eight inches tall, and weighs 154 pounds, (id.) but testified that she weighed 253 pounds two years previously. (<u>Id.</u> at 36.) She attributed her weight loss partly to stomach problems. (<u>Id.</u>) Cox is claiming disability arising from injuries sustained in a car accident. (<u>Id.</u> at 10.)

In January 2003, Cox was involved in a high-speed motor vehicle accident. (<u>Id.</u>) She fractured her left femur, and an intrarmedullary rod was surgically placed in her femur. She also suffered a fracture of her right humerus and a right fronto-parietal subdural hematoma. (<u>Id.</u> at 174.) She underwent physical and occupational therapy, and was discharged from the rehabilitation hospital in stable condition on February 20, 2003. (<u>Id.</u> at 174.)

Cox visited her primary care doctor, Dr. Anne Gordon, on February 25, 2003. (<u>Id.</u> at 167.) During that visit, she denied suffering from any memory loss, but could not remember the details of the accident. (<u>Id.</u>) Dr. Gordon did not perceive any personality changes or cognitive difficulties. (<u>Id.</u>) Cox's mental status exam was unremarkable. (<u>Id.</u> at 169.) Dr. Gordon detected no apparent long-term neurological issues resulting from the hematoma. (<u>Id.</u> at 170.)

A couple of years later, in June 2005, Cox began seeing Dr. Stephen Heacox, an orthopedist. It appears that her chief complaint was discomfort and some swelling in her knees. (Id. at 188.) At the time, she weighed 218 pounds. She also reported a history of hypertension and vertigo. (Id.) Dr. Heacox examined Cox and found no gross deformity of either leg. (Id.) Her alignment was satisfactory and both knees were stable. (Id.) Dr. Heacox found some soft tissue swelling in the right knee and mild swelling in the left knee. (Id.) Cox's medications at the time included Meclizine, Toprol, and Vicodin. (Id.) Dr. Heacox prescribed anti-inflammatory (Voltaren) and anti-depressant (Elavil) medications. (Id.)

Dr. Heacox next saw Cox about a month and half later, on August 26, 2005. (Id. at 187.) Again her chief complaint concerned pain in her right knee, although she also reported some left leg discomfort. Dr. Heacox's note ended: "If over the next 2 weeks she hasn't seen definite improvement she will let me know." (Id.)

According to the record, Cox's next visit with Dr. Heacox was March 15, 2006. (Id. at 186.) On this visit her chief complaint concerned discomfort in her left anterior thigh. Physical examination revealed some quadriceps atrophy and tenderness of the mid-thigh. An x-ray showed no significant hip arthrosis, and Dr. Heacox noted his impression that her symptoms were due to soft tissues and not related to the intramedullary rod. (Id.) He suggested she undertake aquatic physical therapy. (Id.)

Dr. Heacox next saw her about three months later, on June 7, 2006. (Id. at 185.) She reported continued pain in her right knee and left anterior thigh. The focus of the physical examination was on her right knee. (Id.)

At a visit with Dr. Heacox on July 13, 2006, Cox reported that she continued to be "bothered by discomfort in the left groin and right knee." (Id. at 184.) She apparently described

the pain as "intense." (Id.) Dr. Heacox noted some tenderness to palpation in both areas, but no significant restriction of motion. An MRI of Cox's right knee taken at Dr. Heacox's direction on July 15, 2006, (id.) showed intact ligaments, (id. at 189.) The MRI showed some minor issues in the knee. (Id.) After the July 13 examination, Dr. Heacox wrote a letter to Cox's attorney stating that Cox would be able to perform sedentary activities, but was unlikely to maintain employment due to the number of days she would likely need to miss due to periods of increased pain. (Id. at 183.)[2]

Cox was next examined by Dr. Heacox on May 2, 2007. (Id. at 212.) Examination of the right knee showed mild swelling, but the knee was stable to varus, valgus, and Lachman tests. (Id. at 212.) Significant tenderness was found in Cox's left hip, but her range of motion and sensation were satisfactory. (Id.) Dr. Heacox prescribed Vicodin and suggested an activity program. (Id.)

On June 27, 2007, Cox was again seen by Dr. Heacox in the wake of an incident that occurred while she was driving a car. She reported that she had braked suddenly to avoid a deer, and "immediately after the incident began to experience gradually increasing discomfort in the right knee and the anterior aspect of her left hip." (Id. at 211.) She reported being unable to sleep because of the pain, which was unrelieved by the previously prescribed medications. Dr. Heacox prescribed additional medications – Valium, Percocet and Medrol – in the hope "that this will quiet things down." (Id.)

Cox was referred by Disability Determination Services to Dr. John Howard, and she saw him for a consultative examination on July 16, 2007. (Id. at 196-98.) At the time, she claimed she drove her own car and did her own shopping. (Id. at 196.) While she said her memory was

_____

[2]  As noted above, Cox's application for SSI and SSDI benefits was filed as of November 30, 2006. (Id. at 110.)

somewhat limited, Dr. Howard noted that she displayed an excellent recall of the details of her 2003 accident and the financial settlement that resulted from her lawsuit. (Id.) She claimed her ability to calculate and do simple math was excellent, but refused to participate in mathematical testing. (Id.) Dr. Howard felt Cox's actual symptoms of pain appeared related to her left hip, which she reported becomes uncomfortable after standing or walking for an hour or two. (Id.) His physical exam of Cox was unremarkable. (Id. at 197-98.)  Her mental status exam was suggestive of depression. (Id. at 197.)

On the same day, July 16, 2007, Cox was also examined by Dr. Heacox. (Id. at 210.) She told Dr. Heacox that she had been in a car accident – different from the incident with the deer -- while driving four days earlier, July 12. (Id.) This accident is not mentioned in Dr. Howard's notes. (Id. at 196-98.) She sustained contusions and strains to both thighs and her right upper arm.  Dr. Heacox noted that Cox was "somewhat depressed" and "in mild to moderate distress." (Id. at 210.)

On July 23, 2007, Dr. Rosario Palmeri, a Disability Determination Services medical consultant, completed a Physical Residual Functional Capacity Assessment regarding Cox on the basis of a current physical examination. (Id. at 200-07.) He noted that her condition was "rather benign," without neuromotor deficits. He noted that Cox had full range of motion. She noted that she "[e]xperiences pain, controlled." He further noted that Cox had "[n]o severe neuro deficits from the closed head injury." He found some relatively minor exertional limitations by reason of "pain and obesity." (Id. at 201.)

Cox was examined by Dr. Sheree Estes, a psychologist, on September 26, 2007. (Id. at 215-18.) In addition to interviewing Cox, Dr. Estes administered the Wechsler Memory Scale test to her.  (Id. at 217.) Her performance was variable; at times she performed in the average

range, and at other times she performed in the very poor range. (Id. at 218.) Dr. Estes felt that Cox would have trouble with tasks requiring sustained effort. (Id.) Cox denied having issues with attention and concentration, but Dr. Estes felt such issues contributed to Cox's memory problems. (Id.)

On November 1, 2007, Cox had a second consultative exam with Dr. Howard. (Id. at 213-14.) She said her main problem was vertigo, which she claimed began after the 2003 accident. (Id. at 213.) She complained of left hip pain and pain in both knees, but was vague about the pain in her knees. (Id.) She also complained of an occasional left frontal headache similar to a migraine. (Id.) Dr. Howard performed a series of neurological tests as well as a physical exam, and the results for all tests were normal. (Id. at 213-14.)

Cox returned to see Dr. Heacox on November 28, 2007. (Id. at 209.) She complained of discomfort and swelling in her right knee. (She also complained of right shoulder pain.)  Dr. Heacox's note does not mention any attention being given on this occasion to left hip or groin pain. To try to alleviate the right knee pain, Dr. Heacox administered an injection of Lidocaine. (Id.)

Dr. Heacox saw her again on December 5, 2007.  (Id. at 208) She complained of worsening right knee pain. The Lidocaine injection had not given her relief, and she said her pain was "much worse" and kept her from sleeping. (Id.) It appears that the right knee pain was the focus of this visit; the note does not mention the left hip. (Id.)

Cox next saw Dr. Heacox almost a year later on November 5, 2008, for "reevaluation of her left hip and right knee." (Id. at 253.) He noted that she "continues to be bothered by extreme pain in the left proximal thigh," and on examination noted "exquisite tenderness over the proximal anterior thigh in the area of the rectus femoris and anterior lateral aspect of her hip."

(Id.) She had satisfactory hip motion, with only "slight" pain on passive motion, but more pain on active motion. She reported it was uncomfortable to be in a sitting position. Dr. Heacox began to suspect that her hip pain was related to the proximal surgical screw that had been placed during her 2003 surgery. (Id.) As to the right knee, Dr. Heacox noted "slight tenderness to palpation." The knee was stable, with no erythema or warmth. (Id.)

Finally, in her last visit before her hearing before the ALJ, Cox saw Dr. Heacox on December 8, 2008. (Id. at 254.) She again reported "significant discomfort in the anterior aspect of her left proximal thigh." (Id.) Dr. Heacox noted she appeared in "mild distress." As on the previous visit, his examination revealed "exquisite tenderness to palpation over the anterior proximal thigh," with satisfactory hip motion. The plan was to proceed to schedule removal of the surgical screw. (Id.)[3]

Dr. Heacox wrote a letter on Cox's behalf to her attorney in which he expressed his opinion that "she has very limited work possibilities due to the intermittent nature of her severe pain and limited mobility. Her condition requires her to rest for long periods and use narcotic medications in order to maintain some degree of relief." (Id. at 255.)

At the hearing before the ALJ, Cox testified that she had not worked since the onset of her disability. (Id. at 29.) Cox testified that she could not work because she is in constant pain

---

[3] Cox had some hospitalizations in September and October, 2008, for kidney and liver ailments. The records for those hospitalizations do not address the hip and knee pain issues. (See generally id. at 221-252.) Apparently, in connection with those hospitalizations, a Dr. Hanna completed a Residual Functional Capacity Evaluation regarding Cox. (Id. at 219-20.) The date on the evaluation itself is illegible, but the exam is known to have occurred after September 2008, because Cox went to Dr. Hanna that month for a new patient visit. (Id. at 249.) Dr. Hanna found Cox severely limited with respect to her physical functional abilities. (Id. at 219-20.) It is not clear, however, whether his assessment related to her kidney/liver disease and surgery or to her leg pain. It is likely the former, as the contemporaneous medical records do not address the leg pain issues. The kidney and liver symptoms first appeared in 2008, and because her eligibility expired at the end of 2007, they could not be the basis for a disability finding.

where her left leg meets her hip, and she experiences swelling and numbness in her legs. (Id.) She also claimed to experience dizziness causing headaches, as well as difficulty with concentration and memory. (Id.) She testified that she is unable to sit for long, and her leg throbs with prolonged standing and she must lie down. (Id.)

With respect to her day-to-day activities, Cox testified that she usually wakes up around 8 a.m. (Id. at 31.) She takes her medications and lies in bed; she has difficulty sleeping and is usually exhausted when she wakes up. (Id.) Once up, she will watch television, and usually will sleep during the day. (Id.) She does not do any chores, (id.) but is occasionally able to make herself a sandwich, although she eats little due to stomach problems. (Id. at 32.) Her father shops, prepares meals, and does the laundry. (Id.) Due to attention and concentration difficulties, she cannot read or use the computer. (Id.) She testified that she will drive short distances on occasion, but had not driven since the summer before the hearing. (Id. at 32-33.) She testified she is afraid to drive because of her vertigo. (Id. at 33.)

Cox testified that due to leg pain she could not lift more than five pounds. (Id. at 34.) She could not stand for more than ten minutes at a time, and could only sit for a half an hour. (Id. at 35.) She testified that the pain is exhausting, describing it as a constant, hard pinching. (Id.) She told the ALJ that she elevates her legs because of the swelling, which temporarily eases the pain. (Id. at 38.) Lying down on her back is the most comfortable position, although she is never pain-free. (Id.) Cox testified that she had a "brain bleed" which resulted in memory and concentration difficulties. (Id. at 39.) She testified that she could no longer perform her past work as a waitress because she could not remember orders. (Id.) She also asserted that she suffers from headaches and constant dizziness. (Id. at 40.) She takes medication for vertigo, but was unsure if she suffered any side effects. (Id.) Cox concluded her testimony by saying that twice a week, she will

have a "medium day" where she can get out of bed and take a shower; the rest of the week she remains in bed at all times. (Id. at 42.) There are no "good days" for her. (Id. at 41-42.)

In her testimony, the vocational expert ("VE") responded to a hypothetical question posed by the ALJ.[4] Based on the assumptions in the hypothetical, the VE identified approximately 8,000 positions in the Rhode Island and Southeastern Massachusetts area for which someone with Cox's abilities and limitations would be suited. (Id. at 44.) During examination by Cox's lawyer, the VE acknowledged that if Cox were to miss three days of work a month that would jeopardize any possible employment. (Id. at 48.) The VE also testified that Cox would not be able to sustain employment if she could not compete with fellow employees in production for one-third of the day. (Id. at 51.)

The ALJ applied the five-step process required by 20 C.F.R. § 416.920 and determined that Cox was not disabled within the meaning of the Social Security Act. (Id. at 8.) The ALJ found that Cox had not engaged in substantial gainful activity since the alleged onset of her disability, and that Cox had the following severe impairments: residuals of a motor vehicle accident and obesity. (Id. at 9-10.) The ALJ then found that Cox did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id. at 10.) The ALJ concluded that Cox had the residual

---

[4] The ALJ described the hypothetical claimant as follows:

> [She] would be limited to the sitting and standing characteristics of sedentary work. She would also be precluded as in sedentary work for use of leg controls. She would not be able to climb, squat, crouch, crawl or engage in excessive bending. She would have an inability to perform work that was complex or detailed or involve sophisticated tools. Should be limited essentially to uncomplicated work tasks . . . . She would be able to lift and manipulate objects consistent with the light work level of exertion provided she was in the sitting position consistent with sedentary . . . . 10 pounds frequently, 20 pounds occasionally . . . . claimant would be precluded from work that would expose her to unprotected heights or dangerous machinery or driving automotive equipment.

(R. at 43-45.)

functional capacity to perform sedentary to light work as defined in 20 C.F.R § 404.1567(b) and § 416.967(b), except that Cox could not stand or walk for more than two hours in an eight-hour workday. (Id. at 10-11.) The ALJ also found that Cox could not operate foot controls, nor could she climb, squat, crouch, or crawl, or engage in excessive bending. (Id. at 11.) Due to her medications, the ALJ found that Cox could only maintain concentration and attention sufficient to perform unskilled tasks, on the assumption that she will receive short breaks from work approximately every two hours. (Id.)

The ALJ went on to conclude that, due to the limitations contained in the above residual functional capacity assessment, Cox was unable to perform any past relevant work as a waitress or bartender. (Id. at 16.) Considering Cox's age, education, work experience, and residual functional capacity, the ALJ found that there are jobs that exist in sufficient numbers in the national economy that Cox can perform, such as assembler, inspector, and polisher. (Id. at 17.)

### III. Standard of Review

When reviewing a denial of SSDI and SSI benefits, the court must uphold the ALJ's decision if it was supported by substantial evidence, 42 U.S.C. § 405(g); see Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996), even if the record could "arguably justify a different conclusion," Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987). The ALJ's findings must be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (citing Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). It is the responsibility of the ALJ to determine credibility issues, and draw permissible inferences from and resolve conflicts in the evidence. Id. The ALJ is required by regulation to consider all

medical evidence presented, but the question of whether the applicant is disabled is ultimately the ALJ's to decide. 20 C.F.R. § 416.927(e)(1); Rodriguez, 647 F.2d at 222.

## IV.    Legal Analysis

Cox argues that the decision of the ALJ was not supported by substantial evidence. She makes two arguments: first that the ALJ ignored the significance of her closed head injury, and second, that he gave insufficient weight to the opinion of Dr. Heacox, her treating physician.

Her first contention is belied by the ALJ's findings. One of the first pieces of objective evidence addressed by the ALJ is the report of injuries sustained in the January 2003 accident, including, "a right fronto-parietal subdural hematoma with no mass effect." (R. at 12.) The ALJ also addressed the neurological conclusions reached by Dr. Anne Gordon. (Id. at 13.) He specifically addressed plaintiff's complaints of vertigo, emphasizing the fact that she continued to drive after the accident, that there was no medical evidence to substantiate her claims of vertigo despite her having been prescribed medicine for it, and that there was no evidence of ongoing complaints of vertigo until November 2007. (Id. at 14.) He pointed out that neurological examinations of Cox had been normal. (Id.)

It is true that the ALJ did not expressly discuss Dr. Estes' psychological evaluation of Cox. The relevant question is, however, whether Dr. Estes' evaluation undercuts the ALJ's finding. The answer to that question is negative. Dr. Estes concluded that Cox would find it difficult to perform tasks that "required more sustained effort or [were] of a noncontextual nature." (R. at 218.) Consistently with that opinion, the ALJ's assessment of Cox's residual functional capacity limited her to the performance of "simple, routine tasks." (R. at 11, 15.)

Cox further contends that the ALJ should have considered the evidence of her memory impairment because such evidence was deemed relevant to assessing potential job performance

by the VE. During questioning of the VE, Cox's attorney asked if a "moderate to marked" impairment in memory or concentration would affect a person's ability to perform any of the jobs the expert had identified. (R. at 49.) After the ALJ noted he had no basis for interpreting what "moderate to marked" meant, and therefore would be unable to interpret any response given by the VE, Cox's attorney rephrased the question, and asked if an individual's inability to compete with her fellow employees in production for one-third of the day would be relevant to that person's ability to maintain employment. (Id. at 50-51.) The VE responded in the affirmative. (Id. at 51.)

Neither formulation of the question corresponds to terminology used in any medical records in evidence. Neither Dr. Estes nor any other physician described Cox's memory impairment as affecting her productivity for one-third of a traditional workday, nor did any doctor suggest that Cox suffered from a "moderate to marked" impairment in her memory and concentration. Since Cox's attorney did not anchor his questions to the VE in terminology found in the medical records in evidence, the ALJ did not commit an error by choosing to disregard the response given by the expert.

Cox's other argument is that the ALJ disregarded the opinion of a treating physician, Dr. Heacox, and relied instead on the opinion of a non-expert, non-examining physician, Dr. Rosario Palmeri. (Id. at 183, 200-07, 255.)

The issue of whether Cox is disabled is reserved for the ALJ to decide. See 20 C.F.R. § 416.927(e)(1); Rodriguez, 647 F.2d at 222. Dr. Heacox's letters contending that Cox is disabled can be considered by the ALJ in reaching his decision, but are not conclusive evidence of disability. In declining to accept Dr. Heacox's opinion as to disability, the ALJ noted that Dr. Heacox's first letter contained no function-by-function analysis of Cox's physical abilities, and

did not correlate with the largely normal findings of her physical examination, and that his second letter similarly contained no function-by-function analysis and did not cite any objective findings. (R. at 13, 15.)

Cox's contention that the ALJ simply accepted the RFC assessment by Dr. Palmeri in substitution for the opinion of the treating physician, Dr. Heacox, is not an accurate reading of the ALJ's decision. In the first place, the ALJ did not simply adopt Dr. Palmeri's assessment. Dr. Palmeri found Cox capable of performing work in the light exertional range. (R. at 201.) He found Cox capable of sitting, standing, and/or walking for about six hours in an eight-hour workday. (Id.) He did not limit Cox's ability to operate hand or foot controls, and opined that Cox had no other physical limitations. (Id.) The ALJ found significantly more restrictions on Cox's abilities than recommended by Dr. Palmeri, deciding that she could sit, stand, and/or walk for no more than two hours in an eight-hour workday, prohibiting her from operating foot controls, and stating she should never "climb, squat, crouch or crawl, or engage in excessive bending." (Id. at 10-11.) He limited her to unskilled tasks, and suggested short work breaks every two hours. (Id. at 11.)

What the ALJ did was decide that Dr. Heacox's disability opinion was too summary and unsupported by detailed medical findings. (Id. at 13.) Cox argues that the ALJ is not allowed to disregard the treating physician's opinion as insufficient, unsupported, or ambiguous without requesting clarification of the basis of the rejected opinion. See 20 C.F.R. §§ 404.1512(e), 416.912(e). However, these regulations only require the ALJ to request additional clarifying information from a physician if the information originally provided by the doctor is found to be inadequate to determine whether the applicant is disabled. 20 C.F.R. §§ 404.1512(e), 416.912(e). No such finding was made in this case. The ALJ simply found that Dr. Heacox's opinion,

lacking any function-by-function analysis, was not grounded in the objective medical evidence on record. (R. at 13, 15.) Review of Dr. Heacox's records reveals that the ALJ's rejection of the insufficiently supported opinion was defensible. It appears that despite minimal objective findings, Dr. Heacox credited Cox's subjective complaints. The ALJ was not required to do the same.

The ALJ is entrusted with the ability to determine issues of credibility, draw permissible inferences from evidence, and resolve conflicts in the evidence. <u>Ortiz</u>, 955 F.2d at 769. While the ALJ must give special consideration to a treating source's opinion, <u>see</u> 20 C.F.R. § 404.1527(d)(2), Cox herself acknowledges that the ALJ should not be legally bound to abide by the treating source's opinion. It is within the ALJ's authority, as he did here, to consider a treating physician's opinion, but find it insufficient to establish the facts necessary to support a finding of disability.

## **V.** **Conclusion**

For the foregoing reasons, the plaintiff's Motion to Reverse the Decision of the Commissioner of Social Security (dkt. no. 10) is DENIED, and the defendant's Motion for Order Affirming Decision of the Commissioner (dkt. no. 12) is GRANTED. The decision is AFFIRMED.

It is SO ORDERED.

  /s/ George A. O'Toole, Jr.
United States District Judge